UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CRIMINAL ACTION NO. 5:09-CR-46-S-KSF

UNITED STATES OF AMERICA                                                                               PLAINTIFF

vs.                                        **OPINION AND ORDER**

JEREMY KENNEY                                                                                          DEFENDANT

\* \* \* \* \* \* \* \*

This matter is before the Court on motions by Defendant Jeremy Kenney to suppress the fruits of several searches and seizures. The Court has considered the response of the United States, the testimony at the February 19, 2010 suppression hearing and the arguments of counsel. For the reasons discussed below, the motions to suppress will be denied.

I.    BACKGROUND

On December 3, 2008, Kentucky State Police issued a press release announcing traffic safety checkpoints in seven counties "where statistics have shown an elevated number of vehicle crashes." [DE 48, Ex. 1]. "During the checkpoints officers will be enforcing laws related to **Operating a Motor Vehicle While Under the Influence of Drugs or Alcohol, Licensing of Motor Vehicles and Operators, Registration and Insurance Violations, Seat Belt and Child Restraint violations along with Motor Vehicle Equipment Violations**." *Id.,* emphasis in original. Various roadway locations were listed, but the checkpoints were not limited to those locations. *Id.* On December 27, 2008, a checkpoint was activated at approximately 4:19 p.m. on Bryan Station Road in Bourbon County, Kentucky. That road is a main back artery between Fayette and Bourbon counties and is the location of numerous crashes. All vehicles moving in both directions were stopped, and drivers were asked standard questions consisting of requests for their operator's license, registration and proof of insurance. [Eric Barnett ("Barnett"), pp. 6-7, 14, 21, 24]. If the

officer smells alcohol or observes visual signs of impairment, they can ask further questions relating to driving under the influence.  [Barnett, p. 22].

Defendant Jeremy Kenney went through the checkpoint shortly before 4:56 p.m. and was not able to produce his driver's license upon request by Trooper Hawkins.  [Barnett, p. 14-15]. Trooper Hawkins went to the rear of Kenney's vehicle to call in the vehicle license number while Trooper Barnett observed Kenney from outside the driver's side door.  *Id.* at 15.  Mr. Kenney "was being real fidgety in the vehicle" and "disobeyed a couple of commands to keep his hands on top of the steering wheel."  *Id.* at 15-16.  Within a few minutes, Trooper Hawkins advised that Kenney's operator's license was suspended.  Kenney was arrested for operating a vehicle on a suspended license.  *Id.*  Trooper Barnett conducted a search of Kenney's person incident to the arrest and found $3,800 in his pants pocket and around 35 grams of suspected crack cocaine.  *Id.* at 16.  Mr. Kenney told the troopers that he was in route to Lexington to drop off the cocaine.  *Id.* at 17.  He was the only occupant in his 2005 silver Cadillac.  *Id.* at 17-18.

On January 15, 2009, Lexington-Fayette Urban County Government's Narcotics Detective, Albert Dixon, and another detective pulled trash at Jeremy Kenney's residence at 2064 Polk Lane, Lexington, and found a small amount of loose cocaine, three torn plastic baggies with cocaine residue, mail with Kenney's name and that address, and Kenney's parole papers for trafficking in a controlled substance.  [DE 48, Ex. 2; Dixon, p. 35].  Detective Dixon had driven by the house on several occasions, waiting for the trash to be pulled to the curb.  [Dixon, pp. 39-40].  Detective Dixon conducted another trash pull the morning of January 22, 2009 and found approximately 0.6 grams of marijuana.  [Dixon, pp. 41-43; Govt. Ex. 7; DE 48, Ex. 2].  He identified it as marijuana by its appearance and smell.  [Dixon, p. 43].

On January 22, 2009, Detective Dixon prepared an affidavit for a warrant to search 2064 Polk Lane.  [Dixon, p. 33; DE 48, Ex. 2].  The affidavit included additional background information available to Detective Dixon, along with information regarding the trash pulls.  Upon execution of

2

the warrant that day, the officers found drugs and a significant amount of cash. [Dixon, p. 44; DE 48, Ex. 2]. While Dixon was conducting the search of Polk Lane, Trooper Hawkins showed up and advised him that the silver STS Cadillac sitting in the driveway was the vehicle Mr. Kenney was driving when he was stopped recently at the checkpoint and they found a large sum of cash and narcotics. [Dixon, p. 45]. Detective Dixon had previously determined that Mr. Kenney was not employed and that the Cadillac was registered to him. *Id.* at 45-46. Dixon concluded the vehicle should be taken for forfeiture as gains from criminal activity and completed the paperwork for that. [Dixon, pp. 46-47; Dixon, Vol. 2, pp. 3-5; Govt. Ex. 10]. Before they left the residence, Mr. Kenney told Detective Dixon that he was a "kilo-level dealer." [Dixon, Vol. 2, pp. 1-2]. Mr. Kenney was indicted on March 5, 2009 for possession with intent to distribute five grams or more of crack cocaine on December 27, 2008 and January 22, 2009, possession of a firearm in furtherance of drug trafficking, and possession of a firearm by a convicted felon. [DE 1].

In August 2009, ATF Agent Eric Mercer reviewed a recorded jail conversation between Defendant Kenney and his cousin, during which Kenney said he wanted the cousin to get the vehicle when it was released because "you are the only one who knows what's really going on with that car" and "you know what it is worth." [DE 48, Ex. 4, p. 5 of 8]. On August 13, 2009, Mercer met with a K-9 unit at the Lexington Police impound lot, and the K-9 alerted to the presence of narcotic odors at Mr. Kenney's vehicle. *Id.*, p. 6 of 8. On August 14, 2009, Agent Mercer prepared an affidavit for a warrant to search the vehicle. [DE 48, Ex. 4]. As a result of the search, 56 grams of crack cocaine were found in a pouch in the driver's seat of the vehicle. [DE 48, p. 5; Hearing, Vol. 2, p. 33]. On September 3, 2009, a superceding indictment increased the quantity of crack cocaine Kenney possessed on January 22 (Count II) to fifty grams or more. [DE 22].

Defendant Kenney moved to suppress the fruits of the stop and search on December 27, 2008, the fruits of the search of his home on January 22, 2009, and the seizure of his vehicle on January 22, 2009. [DE 42]. In support of the first motion, he claimed that the checkpoint was not

3

an authorized checkpoint and that its actual purpose was subject to question. [DE 42, p. 2]. He noted there was no statement in the police report regarding any reasonable suspicion about Mr. Kenney or his vehicle, and that the burden was on the government to establish that the warrantless checkpoint seizure and search were reasonable under the circumstances. *Id.* at 3.

The second motion to suppress claimed the warrant for the search of Polk Lane was not supported by probable cause. Mr. Kenney argued that much of the information, including that from informants, was stale. He further argued that he kept his trash at the side of his house within the curtilage and did not place it at the curb during the relevant time frame. [DE 42, pp. 3-8].

The third motion argued that police were well aware of Mr. Kenney's vehicle at the time of the search of his residence on January 22, 2009 and even mentioned the vehicle in the affidavit, but there was no request in the warrant to search the vehicle. Because the vehicle to be seized was not particularly described, he claims its seizure violated the Fourth Amendment. *Id.* at 8-10.

## II.  ANALYSIS

### A.  The Checkpoint

In support of his claim that the checkpoint was an unconstitutional warrantless seizure, Mr. Kenney relies on *United States v. Huguenin*, 154 F.3d 547 (6th Cir. 1998), in which the court found a Fourth Amendment violation. In that case, two highway signs warned of a "Drug-DUI" checkpoint one-half mile ahead, but the actual checkpoint was at the end of the first exit ramp, located a quarter mile after the signs. *Id.* at 549. The checkpoint could not be seen until more than fifty yards into the ramp and after a curve. *Id.* Officers approached vehicles at a stop sign, but had no set questions to ask. The officers had discretion whether to ask the motorists their reason for exiting at that road. *Id.* at 550. The ostensible goal of the checkpoint was "to remove impaired drivers from our highways," but there was never a breathalyzer at the checkpoints, only a drug dog. *Id.* Officer Worley was the department's Narcotics Officer and decided where to establish the checkpoint and supervised it. Another officer assisting at the checkpoint, Joe Brock, had "no

4

specific training in detecting intoxicated drivers." *Id.* Officer Brock decided he would ask persons in vehicles with out-of-state license plates why they had used that exit. When the defendants in this case responded they were in search of gasoline, Officer Brock observed their gas gauge indicating a full tank. He did not detect alcohol or other indicators of intoxication and did not ask about drinking. *Id.* After a few minutes, Officer Worley took over the questioning and noted that the driver gripped the steering wheel and would not look at him and that an occupant was shaking and nervous. *Id.* at 551. Worley accused the driver of lying about looking for gas and brought the drug dog to the van where it alerted to the back of the van. Officer Worley opened the back door of the van; and the dog alerted to a blanket on the floor, under which Worley found 265.7 pounds of marijuana. *Id.*

In analyzing the *Huguenin* factual scenario, the Sixth Circuit considered the reasonableness of the checkpoint under the balancing tests of *Brown v. Texas*, 443 U.S. 47 (1979), *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), and *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990). *Huguenin*, 154 F.3d at 552. "The test weighs the 'gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" *Id.*, quoting *Brown*, 443 U.S. at 50-51. In upholding checkpoints, "the Supreme Court has focused on the lack of discretion afforded the individual officers, the standardized procedures employed, and the minimal intrusion imposed on motorists." *Id.* The *Huguenin* court concluded that the primary purpose of this checkpoint was not to identify impaired drivers, but "was to detect narcotics." *Id.* at 555. It condemned pretextual roadblocks as coming "perilously close to permitting unfettered government intrusion on the privacy interests of all motorists." *Id.* at 554.

In balancing the gravity of public concern about drug trafficking with the severity of interference with individual liberty, the *Huguenin* court distinguished the facts in *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976). The court said the checkpoints in *Martinez-Fuerte* were not

5

unduly intrusive because motorists were not taken by surprise; the checkpoints appeared to and actually involved less discretionary enforcement activity; and the location of the checkpoints was chosen by officials responsible for making overall decisions regarding effective allocation of limited resources. *Huguenin*, 154 F.3d at 556. By contrast, the *Huguenin* checkpoint was a surprise and a trap; it involved discretionary enforcement activity, depending on which officer questioned the drivers and whether the vehicle had out-of-state plates; its location was chosen by an officer in the field; and there was room for abusive and harassing questioning depending on the discretion of the individual officer in the field. *Id.*

The *Huguenin* court also distinguished its facts from those in *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990). In *Sitz*, there were guidelines such that all vehicles approaching the checkpoint were stopped and the drivers briefly questioned to determine whether they displayed any signs of intoxication. If there were no indicators of intoxication, the drivers passed through the checkpoint immediately. *Huguenin,* 154 F.3d at 559. Additionally, approaching motorists could see the checkpoint and that every vehicle was being stopped. There were visible signs of the officers' authority. *Id.* at 560. By contrast, in *Huguenin*, the checkpoint was in a secluded area where few people exit and was a "trap, targeting motorists who left the Interstate." *Id.* at 561. It was "hidden until the last possible moment." There "were no guidelines for the actual operation of the checkpoint, and the guidelines for a DUI checkpoint were not followed." *Id.* at 562. The defendants were questioned twice by two officers with inquiries about where the defendants had been and where they were going. The court noted "there is no justification for questions about travel plans in order to determine one's sobriety." *Id.* at 560. Officer Brock had considerable discretion and "he varied his questioning based on whether the approaching vehicle displayed out-of-state or in-state license tags." *Id.* at 562. During 64 different days when the same checkpoint operated, 2342 cars were stopped, but there were only seven arrests for DUI. *Id.* at 555-56. The *Huguenin* court found the checkpoint involved a substantial degree of objective and subjective

6

intrusion with only slight effectiveness in meeting the purported interest. Accordingly, the Sixth Circuit held it was unreasonable under the balancing test. *Id.* at 563.

Another clear distinction between the unconstitutional checkpoint in *Huguenin* and the checkpoint in the present case is discussed in *City of Indianapolis v. Edmond*, 531 U.S.32 (2000). While the checkpoint in *Edmond* was held to violate the Fourth Amendment, the focus of the analysis was on the primary purpose of the checkpoint. The court noted its prior approval of brief checkpoints for border patrol (*Martinez-Fuerte*) and sobriety (*Sitz*). It suggested in *Delaware v. Prouse*, 440 U.S. 648 (1979) "that a similar type of roadblock with the purpose of verifying drivers' licenses and vehicle registrations would be permissible. In none of these cases, however, did we indicate approval of a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing." *Edmond*, 531 U.S. at 38. "[W]hat principally distinguishes these checkpoints from those we have previously approved is their primary purpose." *Id.* at 40. In *Edmond*, as in *Huguenin*, the primary purpose of the checkpoint was narcotics detection. *Id.* Both of those checkpoints involved the use of narcotics-detection dogs around the exterior of the vehicles.[1] "We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes." *Id.* at 44.

In the present case, the primary purpose of the checkpoint was traffic safety, including licensing of vehicles and operators. [Govt. Ex. 1; Barnett, p. 23]. The overall campaign in seven counties was announced by press release. [Govt. Ex. 1]. The road involved "is a main back artery ... between Fayette and Bourbon County that a lot of people use to avoid some of the main roads. We have had numerous crashes on that road." [Barnett, p. 7]. The date and location of the

---

[1] *Edmond* 531 U.S. at 35 ("A narcotics-detection dog walks around the outside of each stopped vehicle"); *Huguenin*, 154 F.3d at 550, 551 ("While the checkpoint was in operation, the county's drug dog, King, was always present." "Officer Worley brought the drug dog to the van.")

checkpoint was decided by Lieutenant Tom Lilly, the operations commander at the post. [Barnett, pp. 20, 28, 11]. The same location had been used for a traffic safety checkpoint one week earlier. [Barnett, p. 30]. There were four trooper units at the checkpoint. [Barnett, p. 11]. The state police cars were parked on the side of the road with blue lights flashing, and the troopers were in uniform standing in the middle of the road to stop cars. [Barnett, pp. 25-26, 28]. There is no evidence that the checkpoint was not fully visible to oncoming motorists. Every vehicle passing in both directions was stopped. [Barnett, p. 14]. The officers used "default" questions for a traffic safety checkpoint, "what we ask of every contact we have with a passing motorist as far as a traffic safety checkpoint, which would be the operator's license, insurance and registration." [Barnett, pp. 21, 29]. These same questions were asked of Mr. Kenney. [Barnett, p. 15].

When he could not produce an operator's license, Kenney was detained for a couple of minutes until Trooper Hawkins determined that Kenney's operator's license was suspended. *Id.* At that point, Kenney was arrested for driving on a suspended license.[2] *Id.* Trooper Barnett testified that people driving on a suspended license are a safety concern for law enforcement because a lot of times the suspension is for DUI, but the individuals continue to drive. [Barnett, p. 30]. The result of a search of Kenney's person incident to the arrest was $3,800 in cash and thirty-five grams of crack cocaine. *Id.* Kenney does not complain about, and there is no evidence of, any search of his vehicle at the checkpoint. The effectiveness of the checkpoint, which operated less than three hours, is shown by forty vehicles passing through, resulting in ten citations, eight notices and one arrest. [Govt. Ex. 1, p. 4 of 6; Barnett, p. 12].

The facts of the present case are strongly similar to the checkpoints in *Martinez-Fuerte* and *Sitz* and to the suggested roadblock in *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). A state's "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles"

---

[2] The Sixth Circuit recently held that an arrest is constitutionally reasonable when an officer observes a person who was driving with a suspended license. *United States v. Johnson*, 336 Fed. Appx. 554, 557 (6th Cir. 2009), citing *Virginia v. Moore*, 553 U.S. 164 (2008).

8

was recognized in *Prouse*. *Id.* at 658. "[W]e suggested that a similar type of roadblock with the purpose of verifying drivers' licenses and vehicle registrations would be permissible." *Edmond*, 531 U.S. at 38. In the present case, there was no more than an initial stop of all vehicles and the associated preliminary questions and observations by officers. The field officers did not have discretion regarding the checkpoint location or the questions asked. *Prouse*, 440 U.S. at 663. The questions were relevant to the traffic safety purpose of the checkpoint. Persons producing the documents were free to leave immediately. The objective level of intrusion on motorists is no greater than that approved in the sobriety checkpoint in *Sitz* or the checkpoint for detecting illegal aliens in *Martinez-Fuerte*. The subjective intrusion on Fourth Amendment rights was also slight, because there were visible signs of the officers' authority and approaching motorists could see that every vehicle was being stopped and questioned. *See Sitz*, 496 U.S. at 453.

The final factor in the *Brown v. Texas* test is "the degree to which the seizure advances the public interest." In *Sitz*, "1.6 percent of the drivers passing through the checkpoint were arrested for alcohol impairment." *Sitz*, 496 U.S. at 455. There was expert testimony that "sobriety checkpoints resulted in drunken driving arrests of around 1 percent of all motorists stopped." *Id.* In *Martinez-Fuerte*, "illegal aliens were found in only 0.12 percent of the vehicles passing through the checkpoint." By contrast, in the present case, 40 vehicles passed through the checkpoint. Ten citations were issued and eight notices for traffic safety violations. One person was arrested for driving on a suspended license. The checkpoint appears to be highly effective in advancing the public interest in traffic safety. Accordingly, this Court holds that the checkpoint was consistent with the Fourth Amendment. The evidence found at the checkpoint will not be suppressed.

**B.     The Search Warrant for the House on January 22, 2009**

At the suppression hearing, defense counsel argued that probable cause was lacking in the four corners of the affidavit for the search warrant. [Hearing, Vol. 2, pp. 20-23; Govt. Ex. 2]. In particular, counsel argued there were two deficiencies. First, there is information attributable to a

9

confidential source, but there is no indication of veracity or the basis of his knowledge, and the only detailed information provided was public information regarding Kenney's address and his vehicle. *Id.* at 21. Second, there is a qualified informant, but the information he provided is stale and makes no connection to the place being searched. *Id.* at 22. The first trash pull mentioned was at a different location and was more than a year and a half earlier. The Government responded that the information complained about is background information that Officer Dixon acted on when he conducted his independent investigation and trash pulls at Kenney's residence, 2064 Polk Lane, on January 15, 2009 and January 22, 2009. *Id.* at 23; Govt. Ex. 2, p. 3 of 4.

Probable cause is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The probable cause determination is made under the "totality-of-the-circumstances," rather than individual pieces of evidence in isolation. *Id.* "Our decisions applying the totality-of-the-circumstances analysis ... have consistently recognized the value of corroboration of details of an informant's tip by independent police work." *Id.* at 241. "It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing "a substantial basis for crediting the hearsay.'" *Id.* at 254-45, quoting *Jones v. United States*, 362 U.S. 257, 269 (1960). The "duty of a reviewing court is simply to ensure that the [issuing] magistrate had a 'substantial basis for ... concluding' that probable cause existed." *Id.* at 238-39.

In *United States v. Martin*, 526 F.3d 926 (6th Cir. 2008), an affidavit for a search warrant said that the affiant had "received information from a confidential informant that there was drug activity at 1219 Greenup Street, Covington, KY [and] the confidential informant had advised that Kenneth Martin resides at that residence." *Id.* at 930. There was no date, nor any other details of the drug activity. The affidavit further stated that the confidential informant had "provided reliable information in the past on multiple occasions that had resulted in seizure of illegal controlled substances." A month later, a trash pull was conducted in front of the residence and cocaine

10

residue was found in the same bag as mail with the residence address. Further investigation revealed that Martin had a prior conviction for trafficking in controlled substances and two prior arrests for possession of marijuana. He also had an active driver's license with that address. *Id.* The court held that the warrant was supported by probable cause. "The confidential informant's minimal facts here were bolstered when the trash pull yielded cocaine residue." *Id.* at 937. *See also United States v. Spikes*, 158 F.3d 913, 924 (6th Cir. 1998) (trash pull ten days before warrant and observation of workers one month before "refreshed" otherwise stale information).

In *United States v. Pressley*, 1991 WL 32362 (6th Cir. 1991), the court affirmed denial of a suppression motion, saying:

> Defendant's argument that the affidavit was based on an anonymous informant's statements is a mischaracterization. The affidavit recited the far more significant fact of the discovery of baggies containing traces of cocaine base in defendant's curbside trash. The reference to an anonymous informant, and various corroborating details of the anonymous informant's story, merely buttressed the substantive evidence.

*Id*. at *4. Likewise, in *United States v. Yarbrough*, 272 Fed. Appx. 438 (6th Cir. 2007), police corroborated an anonymous tip by confirming the names of the occupants and the description of the vehicle located at the residence. They found marijuana in the vehicle and smelled a strong odor of burnt or burning marijuana at the house. *Id.* at *5. Denial of the motion to suppress was affirmed.

In *United States v. Silvey*, 2009 WL 700701 (E.D. Ky. 2009), this Court found probable cause despite an anonymous tip and a claim that the tip was stale. "Even if the March 2008 information had become stale, the October 2008 trash pull refreshed the information." *Id.* at *4.

In the present case, the affidavit contained the following information:

> A confidential source advised that a male black subject named Jeremy Kenney was selling large quantities of cocaine from his residence at 2064 Polk Lane along with distributing cocaine in Paris Ky. The Source also advised that Jeremy Kenney drives a silver model Cadillac with tinted windows possibly STS.
>
> On 03/10/2008 Detective Curtsinger conducted a trash pull at Jeremy Kenney's old address at 1049 Duvall Street and retrieved approximately two buds of suspected

11

marijuana weighing approximately nine grams along with mail-matter in Jeremy Kenney's name with a Paris Ky. address.

On 11/01/2007, a qualified confidential source advised the Narcotics Enforcement Unit that Jeremy Kenney has been selling cocaine for quite some time and has strong ties with other known drug traffickers who the Narcotics Enforcement Unit is familiar with.  This qualified confidential source also advised that Jeremy Kenney was a distributor for drug dealers in Lexington and Paris Ky. and on a prior occasion Jeremy Kenney was observed by the qualified confidential source counting approximately $500,000.00 in U.S. currency.

The affiant checked police computers which revealed that 2064 Polk Lane was the current residence of Jeremy Louis Kenney and he was the registered owner of a 2005 silver Cadillac STS.  Further search revealed that Jeremy Kenney was arrested in 12/28/2003 for possession of marijuana and trafficking in a controlled substance 1st.  On 06/24/2004 Jeremy Kenney was arrested for trafficking in a controlled substance 1st.  On 07/15/2004 Jeremy Kenney was arrested for trafficking in a controlled substance 1st and possession of drug paraphernalia.  On 11/05/2005 Jeremy Kenney was arrested for trafficking in a controlled substance 1st.  Based on the information received, the affiant conducted trash pulls at 2064 Polk Lane.

On 01/15/2009 Thursday, the affiant and Detective Lewis went to 2064 Polk Lane.  Upon checking the residence, the detectives located refuse in a green trash container located at the end of the driveway at the curb.  The affiant removed one large black plastic garbage bag and one white plastic garbage bag with a red twist-ty.  Search of these bags by the affiant revealed a small amount of loose cocaine (that field tested positive), three torn plastic baggies with cocaine residue in them, and mail-matter in the name of Jeremy Kenney and Tracy Williams with the address of 2064 Polk Lane on it.  Further search of the black bag revealed Jeremy Kenney's probation and parole papers for trafficking in controlled substance 1st.

On 01/22/2009 Thursday, the affiant and Detective Lewis went to 2064 Polk Lane.  Upon checking the residence, the detectives located refuse in a green trash container located at the end of the driveway near the curb.  The affiant removed one large black plastic garbage bag.  Search of this bag revealed approximately .6 grams of suspected marijuana.

Govt. Ex. 1.  The Court finds that this affidavit reflects a pattern of criminal activity and that any stale information is refreshed by the trash pulls one week before and the morning of the affidavit and search.  *See Martin, Spikes, Pressley, Yarbrough,* and *Silvey, supra.*  Nexus with the location to be searched is also established by the trash pulls.  Accordingly, the motion to suppress will be denied.

### C. The Automobile Seizure on January 22, 2009

Mr. Kenney complains that the search warrant issued for his residence on January 22, 2009 did not list his vehicle as an item to be searched. [DE 42, pp. 8-10]. He argues that the police were aware of the vehicle, as it was mentioned in the affidavit, but in the location for listing a vehicle to be searched, the warrant says "N/A." [DE 42, p. 9; Govt. Ex. 1]. Kenney generally contends that items must be listed with particularity in a warrant or they cannot be seized. *Id.* Accordingly, he claims that the seizure of his vehicle on January 22, 2009 violated the Fourth Amendment, and that the fruits of the vehicle search conducted several months later pursuant to a warrant must be suppressed.

The United States responds that the vehicle was seized for lawful forfeiture purposes pursuant to KRS 218A.415(1).[3] Narcotics Detective Dixon with the Lexington Division of Police testified that during the search of Kenney's residence, drugs and a significant amount of cash were found. [Dixon, p. 44]. Dixon was already aware of Kenney's prior arrests for trafficking as stated in his affidavit. Govt. Ex. 2. Dixon also found probation and parole papers relating to trafficking in Kenney's trash. *Id.* While the search was in progress, Kentucky State Trooper John Hawkins arrived and advised Detective Dixon that the silver STS Cadillac in the driveway was the vehicle Mr. Kenney was driving recently when he was stopped and a large sum of cash and narcotics were found. *Id.* at 45. Detective Dixon confirmed before the search that the vehicle was registered to Mr. Kenney, and that Mr. Kenney was unemployed. *Id.* at 45-47. Accordingly, he planned to take the vehicle for forfeiture purposes as the gains from drug trafficking. *Id.*

When the vehicle was taken, Detective Dixon completed a Vehicle Seizure Storage Report on which he stated the reason for the seizure was "narcotics trafficking" and that "forfeiture is anticipated." [Govt. Ex. 10]. Detective Dixon also completed a related Memorandum. [*Id.*; Dixon,

---

[3] This investigation was conducted under state law by state officials until shortly before Mr. Kenney's indictment on March 5, 2009. [Hearing, Vol. 2, p. 29].

p. 47; Dixon Vol 2, pp. 3-5]. Additionally, before Detective Dixon left the residence, Mr. Kenney advised that he was a "kilo-level dealer." [Dixon, Vol. 2, pp. 1-2]. The vehicle was never searched until a federal search warrant was obtained several months later on August 14, 2009. [DE 48, Ex. 4]. The Court also notes that Mr. Kenney admitted trafficking in narcotics, both to Trooper Hawkins and to Detective Dixon and that he was cooperating with the officers. [Hearing, Vol. 2, p. 32].

KRS 218A.415(1) provides in part that: "Seizure of personal property without process may be made if: (d) The law enforcement agency has probable cause to believe that the property is subject to forfeiture pursuant to this chapter." In *Bush v. Banks,* 1999 WL 313883, (6th Cir. 1999), the Sixth Circuit noted the district court's decision regarding seizure of a vehicle pursuant to KRS 218A.415 that "no constitutional deprivation occurred because probable cause existed for the seizure of Plaintiff's Bronco by the Sheriff's Department." *Id.* at *2. The only constitutional issue raised previously under this particular statute was a due process violation for delay in seeking forfeiture of real property. *Hinkle v. Commonwealth*, 104 S.W.3d 778 (Ky. Ct. App. 2002).

In *Florida v. White*, 526 U.S. 559 (1999), the court upheld a warrantless seizure of a vehicle where the police "had probable cause to believe that the vehicle *itself* was contraband." *Id.* at 565.

> Recognition of the need to seize readily movable contraband before it is spirited away undoubtedly underlies the early federal laws relied upon in *Carroll*. This need is equally weighty when the *automobile*, as opposed to its contents, is the contraband that the police seek to secure.

*Id.,* citations omitted. While the seizure there was in a public place, it is not clear that there is a prerequisite of a public place to avoid a Fourth Amendment violation.

Moreover, the Supreme Court recently emphasize that "exclusion 'has always been our last resort, not our first impulse.'" *Herring v. United States*, 129 S.Ct. 695, 700 (2009), quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). The exclusionary rule "applies only where it 'results in appreciable deterrence.'" *Id.*, quoting *United States v. Leon*, 468 U.S. 897, 909 (1984). "In addition, the benefits of deterrence must outweigh the costs." *Id.* "To trigger the exclusionary rule,

police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 702.

In *Illinois v. Krull,* 480 U.S. 340 (1987), the court said:

> The application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant. Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law.

*Id.* at 349-50. In the present case, the officer reasonably relied on a statute that has not been declared unconstitutional. His conduct does not trigger the exclusionary rule.

The Court finds that there was probable cause for Detective Dixon to believe that the Cadillac was contraband and that it was subject to seizure for purposes of forfeiture under Kentucky law without a warrant. The contemporaneous documents prepared by Detective Dixon reflect a seizure for purposes of forfeiture. Govt. Ex. 10. Accordingly, the motion to suppress the fruits of the seizure of the vehicle will be denied.

### III.    CONCLUSION

**IT IS ORDERED** that Defendant Jeremy Kenney's motions to suppress evidence [DE 42] are hereby **DENIED**.

This March 3, 2010.



Signed By:

*Karl S. Forester*  KSF

**United States Senior Judge**